UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KAREN SPENCER,

   *Plaintiff*,

 v.

DENIS MCDONOUGH,

   *Defendant*.

Civil Action No. 23 - 1998 (LLA)

**MEMORANDUM OPINION**

  Karen Spencer brings this action against Denis McDonough in his official capacity as Secretary of Veterans Affairs. Ms. Spencer alleges that the Department of Veterans Affairs discriminated and retaliated against her based on her race and her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ECF No. 16. The Department has moved to dismiss or, in the alternative, for summary judgment. ECF No. 17. For the reasons explained below, the court will grant the Department's motion and dismiss the case.

    **I. FACTUAL BACKGROUND**

  The following factual allegations drawn from Ms. Spencer's amended complaint, ECF No. 16, are accepted as true for the purpose of evaluating the motion before the court, *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). The court may also take judicial notice of documents from Ms. Spencer's administrative proceedings with the Department's Equal Employment Opportunity ("EEO") office. *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018) (explaining that "[i]n employment discrimination cases, courts often take judicial

notice of [Equal Employment Opportunity Commission ("EEOC")] charges and EEOC decisions" in evaluating a motion to dismiss).

Beginning in August 2006, Ms. Spencer—an African-American woman—worked as a pain nurse practitioner at the Veterans Affairs ("VA") Medical Center in Washington, D.C.  ECF No. 16 ¶ 6.  She worked in the Department of Neurology before moving to the Department of Mental Health in 2012.  *Id.*  The VA Medical Center uses a "scope of practice" ("SOP") to set the "boundaries under which a medical clinician practices," which "is signed by the facility director and renewed" at periodic intervals.  *Id.* ¶ 8.  "The purpose of an SOP is to ensure safety for the provider and patient."  *Id.*

In 2007, Dr. Friedhelm Sandbrink, the Chief of the Pain Clinic, trained Ms. Spencer to perform "trigger point injections," which are "injections done with an anesthetic or dry needle, palpating scar tissue in hopes of relieving pain."  *Id.* ¶ 7.  That year, Ms. Spencer renewed her SOP to confirm that she was authorized to conduct trigger point injections.  *Id.* ¶ 8.  When she transferred to the Mental Health Department in 2012, she was assigned a new supervisor—Dr. Maria Llorente—but her SOP remained unchanged.  *Id.*

In August 2017, Drs. Dominique Neptune and Charles Faselis became Ms. Spencer's primary and secondary supervisors, respectively.  *Id.* ¶ 10.  Dr. Neptune is an African-American woman, ECF No. 17-3, at 2, and Dr. Faselis is a white man.  ECF No. 16 ¶ 10.  In June 2018, staff discovered a capped syringe on Ms. Spencer's office desk during a routine safety inspection.  *Id.* ¶ 11; ECF No. 17-3, at 64.  Ms. Spencer had left the capped syringe on her desk after conducting a one-off trigger point injection for a patient.  ECF No. 16 ¶ 11.  The discovery prompted an investigation, resulting in Dr. Neptune's placing Ms. Spencer on a Focused Professional Performance Evaluation ("FPPE") plan, which is "similar to a performance improvement plan."  *Id.*

¶ 12. Dr. Neptune prohibited Ms. Spencer from practicing through August 2018.[1] *Id.* Even though Ms. Spencer "demonstrated improvement," she was not removed from the FPPE. *Id.*

In December, Ms. Spencer—still on the FPPE—asked Dr. Faselis when she would be removed from the performance plan. *Id.* ¶ 14. Dr. Faselis replied that she "would be on the FPPE for a long time because she [was] 'a problem child' and nobody wanted her there." *Id.* Ms. Spencer responded by telling Dr. Faselis that the Department "was discriminating against her because of her race." *Id.* ¶ 15. According to the amended complaint, Dr. Faselis "believed that Ms. Spencer was accusing him of being a racist." *Id.*

Dr. Faselis subsequently initiated a second investigation into Ms. Spencer's conduct, but Ms. Spencer was not informed of this new investigation until January 2019 and she did not participate in it. *Id.* Dr. Faselis did not acquire permission from the facility director—Dr. Michael Heimall—to initiate the second investigation. *Id.*

At some point in January 2019, Ms. Spencer "filed a complaint" with the Department's EEO office, but she does not specify the nature of that complaint. *Id.* Following the results of the second investigation, Dr. Faselis recommended to Dr. Heimall that Ms. Spencer's privileges be suspended. *Id.* On January 30, 2019, Dr. Faselis met with Ms. Spencer and gave her an official suspension letter and notified her that she had several days to respond to the findings. *Id.* ¶ 16; ECF No. 17-3, at 65. He explained that she "was being suspended because she was practicing outside of her SOP." ECF No. 16 ¶ 16. As a result of the suspension, Ms. Spencer lost access to her office and was prohibited from being in contact with patients. *Id.* ¶ 17. Even though Ms. Spencer wrote a rebuttal letter in mid-February, the suspension remained in place. *Id.*

---

[1] In her amended complaint, Ms. Spencer implies that she was placed on the FPPE beginning in August 2018, but the EEOC determined that she was placed on the FPPE in October 2018. *See* ECF No. 17-3, at 9.

3

In March 2019, Ms. Spencer asked Dr. Heimall for an update on when her suspension would end, but he suspended her privileges a second time, explaining that there were "significant concerns regarding [her] clinical practice and clinical judgment" and he "needed to follow the Bylaws." *Id.* ¶ 18. Ms. Spencer alleges that these "concerns" were unsubstantiated and that Drs. Heimall, Faselis, and Neptune never adequately explained what she needed to do to improve or pass her FPPE. *See id.*

In May 2019, Dr. Heimall suspended Ms. Spencer's privileges suspended for a third time. *Id.* ¶ 18. Two months later, in July 2019, the Department terminated Ms. Spencer "based on [Dr.] Heimall's conclusion that Ms. Spencer was practicing outside of her SOP." *Id.*

At some point during Ms. Spencer's tenure at the Medical Center, a white female resident misdiagnosed a patient, eventually resulting in the amputation of the patient's leg. *Id.* ¶ 19. Ms. Spencer alleges that the resident had misread a patient's chart, failed to properly examine his leg, and treated him with a drug that he was allergic to. *Id.* Even so, the "doctors who treated this patient were not written up, investigated[,] or terminated and are still practicing." *Id.* Dr. Heimall later testified that the resident in question had "failed to provide or meet the standard of care for [the patient]," but he "did not recommend that the resident be banned." *Id.* Separately, one of Ms. Spencer's colleagues testified under oath that, on multiple occasions, nurses in a separate medical department "did not properly dispose of syringes . . . [but] were not disciplined" or terminated. *Id.*

## II.   PROCEDURAL HISTORY

On May 6, 2019, Ms. Spencer contacted an EEO counselor for informal counseling and raised a single claim of racial discrimination based only on her May suspension. ECF No. 17-3, at 53-55, 57-58. On June 5, she filed a formal EEO charge, raising claims of racial discrimination

based on her three suspensions. *Id.* at 21-22. On July 15, the EEO office informed Ms. Spencer that it had accepted for processing a single claim of racial discrimination based on the May suspension. *Id.* at 60 ("Your complaint of discrimination raises the following claim: Whether the Complainant was discriminated against based on race (Black) when on May 4, 2019, Michael Heimal [sic], Director, suspended her privileges for thirty days."). The notice of acceptance stated that if Ms. Spencer "believe[d] that the accepted claim [was] improperly formulated, incomplete, or incorrect," she had to notify the office within seven days, otherwise the office would "assume that the claim is correctly stated." *Id.* Ms. Spencer did not object. *See id.* at 63 (Ms. Spencer's affidavit describing her only claim as racial discrimination based on the May suspension). While the EEOC notice only accepted the discrimination claim related to Ms. Spencer's May 2019 suspension, the EEOC ultimately considered discrimination and retaliation claims premised on her eventual termination. *See id.* at 7 & n.1. In April 2023, following discovery and several hearings, an EEOC Administrative Law Judge ruled in favor of the Department, concluding that Ms. Spencer had failed to prove racial discrimination or retaliation by a preponderance of the evidence. *Id.* at 7-19.

In July 2023, Ms. Spencer filed this action. ECF No. 1. In February 2024, she filed an amended complaint alleging that the Department had discriminated against her (Count I) and retaliated against her (Count II) on the basis of her race and her sex. ECF No. 16. The Department moved to dismiss or, in the alternative, for summary judgment. ECF No. 17. The matter is fully briefed. ECF Nos. 20, 21.

### III.    LEGAL STANDARDS

Under Rule 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Although the plausibility standard does not require "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor will "'naked assertion[s]' devoid of 'further factual enhancement'" suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). While a plaintiff need not establish a prima facie case of discrimination at the pleading stage, she must allege sufficient facts beyond mere legal conclusions to allow the court to draw a reasonable inference of discrimination from the complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002). "If a Title VII plaintiff fails to plead 'sufficient factual matter' to state a discrimination claim that is 'plausible on its face,' then the district court should dismiss the case before discovery." *Chambers v. District of Columbia*, 35 F.4th 870, 878 (D.C. Cir. 2022) (en banc) (quoting *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015)); *see Rouse v. Berry*, 680 F. Supp. 2d 233, 238 (D.D.C. 2010).

In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)). As noted, the court may also take judicial notice of the plaintiff's EEO materials without converting a motion to dismiss into one for summary judgment. *Golden*, 319 F. Supp. 3d at 366 n.2.

## IV.  DISCUSSION

The court begins by addressing whether Ms. Spencer properly exhausted administrative remedies for each of her claims before turning to the merits of the complaint.

### A.  Exhaustion

A plaintiff may not initiate a civil action under Title VII until she has exhausted her administrative remedies for each discrete discriminatory or retaliatory act. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002); *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 33-34 (D.C. Cir. 2014) (citing 29 U.S.C. § 794a(a)(1)). For federal employees, exhaustion allows the federal agency "to handle matters internally whenever possible." *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). The exhaustion process begins when the federal employee "initiate[s] contact" with her agency's EEO counselor, which must be done within forty-five days of the alleged discriminatory act. 29 C.F.R. § 1614.105(a)(1). "Each discrete discriminatory act starts a new clock for filing charges alleging that act[]"—meaning any claim arising out of an act not raised with an EEO counselor within forty-five days cannot be pursued. *Morgan*, 536 U.S. at 113.

If the employee's grievance is not resolved through informal counseling, the employee may file a formal complaint, which the agency investigates and adjudicates. 29 C.F.R. § 1614.106. The issues raised in the formal administrative complaint are the only ones that may be addressed in later court proceedings. *Webster v. Del Toro*, 49 F.4th 562, 566 (D.C. Cir. 2022) (explaining that Title VII plaintiffs must "present a . . . complaint of discrimination or retaliation to the employing agency before pressing it in court" by "filing an initial charge with [the] agency" (internal quotation marks omitted) (quoting *Loe v. Heckler*, 768 F.2d 409, 417 (D.C. Cir. 1985))); *see Bain v. Off. of the Att'y Gen.*, 648 F. Supp. 3d 19, 44 (D.D.C. 2022). "A complainant may amend a complaint at any time prior to the conclusion of the investigation to include issues or

claims like or related to those raised in the complaint." 29 C.F.R. § 1614.106(d). The agency must "acknowledge receipt of . . . an amendment to a complaint in writing." *Id.* § 1614.106(e). A plaintiff who amends her complaint to allege new instances of discrimination or retaliation does not need to reengage in the informal EEO process because the amendment puts the agency on notice of the conduct at issue. *See Sanders v. Kerry*, 180 F. Supp. 3d 35, 43 (D.D.C. 2016) (collecting cases); *see also Weber v. Battista*, 494 F.3d 179, 184 (D.C. Cir. 2007) (holding that the plaintiff had exhausted her administrative remedies by amending her EEO complaint).

Failure to exhaust administrative remedies is an affirmative defense, which means the defendant bears the burden to plead and prove the plaintiff's failure to exhaust. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). If the defendant meets this burden, then the burden shifts, and the plaintiff must "plead[] and prov[e] facts supporting equitable avoidance of the defense." *Id.*

In her amended complaint, Ms. Spencer raises race-based and sex-based claims of discrimination and retaliation, all arising out of the Department's December 2018 investigation, her January, March, and May 2019 suspensions, and her ultimate July 2019 termination. ECF No. 16 ¶¶ 21-36. In its motion to dismiss, the Department argues that the only claims that are properly before this court are (1) Ms. Spencer's race-based discrimination claims concerning her May 2019 suspension and ultimate termination and her (2) race-based retaliation claim concerning her termination. ECF No. 17-1, at 11.[2] The court agrees with the Department.

---

[2] The Department acknowledges that Ms. Spencer exhausted her race-discrimination claim concerning her May 2019 *suspension* and concedes that it waived any exhaustion defense to her race-discrimination and retaliation claims concerning her *termination* by "elect[ing] to investigate and adjudicate [them], notwithstanding [Ms. Spencer's] failure to exhaust them." ECF No. 17-1, at 11.

8

As a threshold matter, Ms. Spencer appears to concede in her opposition that her race-based claims concerning the December 2018 investigation, January 2019 suspension, and March 2019 suspension, as well as all of her sex-based claims, were not exhausted.  In its motion to dismiss, the Department raised an exhaustion defense for each of these claims, but Ms. Spencer did not rebut them in her opposition.  Indeed, she mentions exhaustion only twice in her opposition: (1) a flat assertion that she "exhausted all administrative remedies" (without any elaboration), ECF No. 20, at 9, and (2) an acknowledgement that the Department waived an exhaustion defense as to her termination-based claims, *id.* at 11 n.2.  She otherwise fails to defend the viability of her unexhausted claims.  *See generally* ECF No. 20.[3]  Under D.C. Local Rule 7(b), when "a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." *Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014)).  The court could therefore elect to treat the exhaustion argument on these claims as conceded.

Even apart from the concession, Ms. Spencer cannot establish that she exhausted these claims.  As discussed, the first step in the exhaustion process is for the employee to initiate contact with an EEO counselor within forty-five days of the alleged discriminatory act.  29 C.F.R. § 1614.105(a)(1); *Stewart v. Ashcroft*, 352 F.3d 422, 425 (D.C. Cir. 2003) (explaining that the forty-five-day deadline acts as "a statute of limitations").  Ms. Spencer's first contact occurred on May 6, 2019, two days after her May suspension began.[4]  ECF No. 17-3, at 54.  Ms. Spencer told

---

[3] In a footnote, Ms. Spencer argues that her discrimination claims premised on her *termination* are "properly before this [c]ourt."  ECF No. 20, at 11 n.2.  She conspicuously does not make a similar assertion with respect to the other claims.

[4] In her amended complaint, Ms. Spencer asserts that she "filed a complaint with the Agency's EEO office in January 2019," ECF No. 16 ¶ 15, but she does not explain the nature, context, or details of that complaint.  There is also nothing in the administrative record indicating that such a complaint was filed.  *See generally* ECF No. 17-3.

9

the counselor that "she was discriminated against based on [her] race (Black) when Mr. Michael Heimall (white) . . . suspended her privileges for thirty days." *Id.* The report plainly does not raise any sex-based discrimination claim or any retaliation claim. *See id.* It also fails to mention any other discrete act, aside from a brief reference to the other two suspensions. *See id.* It does not, for example, discuss the Medical Center's December 2018 investigation. And even if it had, the initiation and conclusion of that investigation occurred more than forty-five days before Ms. Spencer contacted the EEO counselor.

The only other discrete act that conceivably falls within the forty-five-day range is the March 2019 suspension. But after Ms. Spencer attempted to file a formal EEO charge based on all three suspensions, the EEO office informed her that it had only accepted a single race-based discrimination claim premised on the May 2019 suspension. *Id.* at 60. The notice gave Ms. Spencer an opportunity to correct any mischaracterizations about her claims, but she failed to do so. *See id.* at 63. If Ms. Spencer wanted to expand the universe of alleged discriminatory incidents, she should have corrected the Department's understanding. By not doing so, she permitted the Department to "assume that the claim [was] correctly stated." *Id.* at 60. Therefore, all of Ms. Spencer's sex-based claims and each of her claims premised on events that took place before the May 2019 suspension were not exhausted.

*   *   *

Given Ms. Spencer's failure to exhaust, only the following claims are properly before the court:

- A race-based discrimination claim based on Ms. Spencer's May 2019 suspension;
- A race-based discrimination claim based on Ms. Spencer's termination; and
- A race-based retaliation claim based on Ms. Spencer's termination.

**B.     Merits**

The court begins by discussing Ms. Spencer's race-based discrimination claims before turning to her race-based retaliation claim.

*1.     Discrimination*

Under Title VII, it is unlawful for an employer to discriminate against an employee with respect to their "compensation, terms, conditions, or privileges of employment" because of their "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff bringing a discrimination claim under Title VII must allege that (1) she belongs to a protected class, (2) she suffered an adverse employment action, and (3) a causal connection exists between her protected characteristic and the adverse employment action. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). There is no dispute that Ms. Spencer is a member of a protected class on the basis of her race or that she suffered an adverse employment action. *See* ECF No. 20, at 16. The Department argues that Ms. Spencer fails at the last step of the Title VII inquiry, *see* ECF No. 17 at 15-16, and the court agrees.

A plaintiff can demonstrate causation in one of two ways. She may "show[] 'that she was treated differently from similarly situated employees who are not part of the protected class.'" *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)). Alternatively, she can show direct evidence of discrimination, which usually takes the form of a "statement that itself shows . . . bias [against a protected class] in the [employment] decision." *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 394 (D.C. Cir. 2020) (alterations in original) (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam)). Ms. Spencer does not plausibly plead that she is similarly situated to other employees and she does not attempt to demonstrate direct evidence of discrimination.

While the burden of showing causation is "'not onerous' at the motion-to-dismiss stage, it requires more than the bald assertion that there is a similarly situated comparator." *Hollingsworth v. Vilsack*, No. 23-CV-2427, 2024 WL 4332118, at *10 (D.D.C. Sept. 27, 2024) (quoting *SS & T, LLC v. Am. Univ.*, No. 19-CV-721, 2020 WL 1170288, at *4 (D.D.C. Mar. 11, 2020)). When conducting its analysis, the court looks to "the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015). Ms. Spencer posits two possible comparators: (1) an unnamed white female resident, and (2) unnamed nurses in a different department.[5] *See* ECF No. 16 ¶ 19-20. Neither is sufficient, even at this early stage.

At the outset, Ms. Spencer cannot demonstrate that her job responsibilities were sufficiently similar to those of the white female resident. Ms. Spencer was a pain nurse practitioner, *id.* ¶ 4, whereas the resident was a physician, *id.* ¶ 19. Employees who occupy "different roles" are unlikely to be appropriate comparators because employers may reasonably treat them differently. *Burley*, 801 F.3d at 302. Ms. Spencer presents no meaningful opposition to this, stating only that "[she] pled that the resident 'functioned basically the same' as [her] in her job duties." ECF No. 20, at 22 (quoting ECF No. 16 ¶ 19). But merely pleading that another employee was similarly situated "is just a legal conclusion," not a statement of fact. *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 103 (D.D.C. 2021) (quoting *SS & T*, 2020 WL 1170288, at *5). The court thus does not afford such an assertion the presumption of truth. *See, e.g., Duberry v. Inter-Con Sec. Sys., Inc.*, 898 F. Supp. 2d 294, 297 (D.D.C. 2012) (declining to "presume the veracity of legal conclusions

---

[5] According to the EEOC's findings of fact, this unnamed resident was actually African-American, not white. ECF No. 17-3, at 12. However, Ms. Spencer cannot show causation even if the court assumes that the resident was white. *See infra* pp. 12-14.

12

that are couched as factual allegations"). Ms. Spencer cannot overcome a motion to dismiss by simply stating that a similarly situated comparator exists.

Ms. Spencer fares slightly better in arguing that she and the white female resident "were disciplined by the same supervisor[s]." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016). Drs. Neptune, Faselis, and Heimall all played a role in disciplining Ms. Spencer. *See* ECF No. 16 ¶¶ 12 (Dr. Neptune), 15 (Dr. Faselis), 18 (Dr. Heimall). While Ms. Spencer does not allege that the former two actively supervised the white female resident, she does assert that Dr. Heimall—the Medical Center's facility director—served as the final, disciplinary entity for all Medical Center employees. *Id.* ¶ 19. Even if Dr. Heimall did not make the initial recommendation to mete out discipline, the court can reasonably infer that he had similar disciplinary authority over both Ms. Spencer and the white female resident. *See Wheeler*, 812 F.3d at 1116 (holding that multiple employees were subject to discipline by the "same decision makers" where their separate supervisors all "reported to [one] [d]irector" and "were subject to the decisional authority of the . . . [h]uman [r]esources department").

Ms. Spencer cannot, however, demonstrate that she and the white female resident committed offenses of "comparable seriousness." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). Ms. Spencer asserts that her infraction was far less significant than the resident's. ECF No. 16 ¶ 19; ECF No. 20, at 20. But in making this argument, she obfuscates the true nature of both violations. Ms. Spencer portrays her mistake as innocuous—simply leaving a capped syringe on the desk in her office—while simultaneously accusing the resident of causing a patient's leg amputation. ECF No. 16 ¶ 19. In actuality, according to the amended complaint, Ms. Spencer was disciplined for "practicing outside of her SOP" by conducting "trigger-point injection[s] in her office." *Id.* ¶¶ 11, 16. In other words, she engaged in activities outside the acceptable "boundaries"

13

she was authorized to perform. *Id.* ¶ 8. By comparison, the white female resident "failed to provide or meet the standard of care" by incorrectly diagnosing a patient. *Id.* ¶ 19. Ms. Spencer does not allege facts demonstrating that these two types of infractions—engaging in prohibited conduct and mistakenly assessing a patient—are similar in nature. Her flat assertion that "the resident's offense substantially eclipsed any purported offenses of [her own]," ECF No. 20, at 22, is nothing more than a disguised legal conclusion that the offenses were legally comparable. That is not enough to defeat a motion to dismiss.

For the same reasons, Ms. Spencer cannot show that she was similarly situated to the unnamed nurses who "did not properly dispose of syringes." ECF No. 16 ¶ 20. First, she does not even allege that these nurses are outside of her protected class. *See id.* Indeed, she provides no detail whatever about the nurses' races, thus flunking the foundational requirement for the comparator analysis. *See Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (concluding that certain employees were improper comparators because they belonged the plaintiff's protected class). Second, these nurses worked in an entirely different medical department than Ms. Spencer. ECF No. 16 ¶ 20. She does not allege that they were subjected to the same policies, regulations, or rules. Nor does she allege that their responsibilities were even remotely similar to hers. And even assuming that the nurses could also be disciplined by Dr. Heimall, she does not allege that improperly disposing of syringes is equivalent to acting beyond one's SOP. *See id.*

In sum, Ms. Spencer fails to demonstrate that "the employer treated other employees of a different race . . . more favorably in the same factual circumstances." *Burley*, 801 F.3d at 301 (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008)). The court will accordingly dismiss Count I of the amended complaint.

*2.     Retaliation*

A plaintiff must allege three elements for a Title VII retaliation claim: that (1) she engaged in protected activity (i.e., "opposed any practice" unlawful under Title VII or "made a charge, testified, assisted, or participated" in an "investigation, proceeding, or hearing," 42 U.S.C. § 2000e-3(a)); (2) she suffered a "materially adverse" action that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination,'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)); and (3) there is a causal connection between the protected activity and adverse action, *id*. at 69-70.  As discussed previously, only Ms. Spencer's race-based retaliation claim concerning her July 2019 termination is properly before this court.  *See supra*, Part IV.A.  While Ms. Spencer likely satisfies the first two elements, the court concludes that she has not sufficiently alleged causation.

As a clarifying matter, Ms. Spencer premises her retaliation claim on a single protected activity: when she accused the Department of racial discrimination in December 2018.  ECF No. 16 ¶ 33 (asserting that the Department "subjected Plaintiff to unlawful retaliation after she reported to Dr. Faselis that she was being subjected to discrimination in December 2018").  She does not base her retaliation claim on her filing a formal EEO charge and acknowledges as much in her opposition.  *See* ECF No. 20, at 15 ("Plaintiff satisfies the first element of the prima facie case [of retaliation] by pleading . . . that . . . '[she] told Dr. Faselis [in 2018] that the Agency was discriminating against her because of her race.'" (quoting ECF No. 16 ¶ 19)).  Her claim thus boils down to the allegation that the Department retaliated against her for her December 2018 statement by terminating her in July 2019.

Ms. Spencer first claims to possess "direct evidence" of retaliatory "animus." ECF No. 20, at 12.  Specifically, she alleges that, in December 2018, "Dr. Faselis initiated a second investigation

15

because Ms. Spencer had complained about her supervisor, Dr. Neptune, and [Dr. Faselis] perceived that Ms. Spencer was accusing him of being a racist." ECF No. 16 ¶ 33; *see* ECF No. 20, at 12 (citing this allegation as "direct evidence" of retaliation). This fails for three reasons.

First, this argument tries to connect a conversation with Dr. Faselis to the December 2018 investigation, not to Ms. Spencer's ultimate termination in June 2019. As discussed previously, *supra* Part IV.A, Ms. Spencer's retaliation claim premised on the December 2018 investigation is not properly before the court.

Second, even if the court were to overlook that defect, Ms. Spencer's *own* statements about whether she believed she was being discriminated against is not direct evidence of *another* individual's animus. Direct evidence can be "any statement or written document showing a discriminatory motive on its face." *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 181 (D.D.C. 2013) (quoting *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006)). It often takes the form of a "statement that itself shows . . . bias [against a protected class] in the [employment] decision." *Ayissi-Etoh*, 712 F.3d at 576 (third alteration in original). Asserting that "[Dr. Faselis] perceived that Ms. Spencer was accusing him of being a racist," ECF No. 16 ¶ 33, does not show any retaliatory motive or bias on the part of Dr. Faselis. At most, it indicates that Ms. Spencer *thought* some bias existed. And a plaintiff cannot defeat a motion to dismiss by simply stating that she believed she was being discriminated or retaliated against on the basis of her protected class. Such an assertion is "just a legal conclusion," which is "never enough to state a claim." *Doe #1*, 554 F. Supp. 3d at 103 (internal quotation marks omitted) (quoting *SS & T*, 2020 WL 1170288, at *5).

Third, even if "Dr. Faselis said he conducted the [second] investigation because [Ms. Spencer] [had] complained to him about Dr. Neptune," ECF No. 20 at 13 (quoting ECF No. 17-3 at 65),

16

Ms. Spencer does not connect that complaint to any protected activity. She vaguely alleges that she "told Dr. Faselis that the Agency was discriminating against her because of her race," ECF No. 20, at 12 (quoting ECF No. 16 ¶ 15), but she does nothing to link her complaint about Dr. Neptune (an African-American woman like Ms. Spencer, *see* ECF No. 17-3, at 8), to race discrimination. Indeed, Ms. Spencer represented to the EEOC that she thought "Dr. Neptune had 'ill feelings' against her" and "did not believe Dr. Neptune's alleged mismanagement was based on [Ms. Spencer's] race." *Id.* at 11. If Dr. Faselis initiated the December 2018 investigation because of an intra-office dispute between Dr. Neptune and Ms. Spencer, that is not direct evidence of race-based retaliation.

Without direct evidence to rely on, Ms. Spencer next argues that she can show causation through temporal proximity. But temporal proximity generally "support[s] an inference of causation 'only where the [protected activity and adverse action] are very close in time.'" *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012)). While the circumstances of each case are unique, the D.C. Circuit has explained that even a gap of two-and-a-half months can be too attenuated to show causation. *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009); *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing opinions holding that three-month and four-month gaps were insufficient). Here, the gap was at least six months. *See* ECF No. 16 ¶¶ 14, 18. The court concludes that Ms. Spencer therefore cannot rely on temporal proximity alone to show retaliatory causation.

Finally, Ms. Spencer asserts that her amended complaint survives despite these deficiencies because, "[a]t the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case." ECF No. 20 at 14 (alteration in original) (quoting *Brown*, 774 F.3d at 1022). That is true as far as it goes, but "the ordinary rules for assessing the sufficiency of a complaint [still] apply." *Swierkiewicz*, 534 U.S. at 511. And, without more,

17

Ms. Spencer's allegations do not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. Her purported protected activity is too distant—both temporally and inferentially—to state a claim for retaliation.

## V. CONCLUSION

For the foregoing reasons, the court will grant the Department's Motion to Dismiss, ECF No. 17. A contemporaneous order will issue.

_____
LOREN L. ALIKHAN
United States District Judge

Date:   January 23, 2025